J-S45008-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JUSTIN M. BURKE | : | |
| | : | |
| Appellant | : | No. 428 MDA 2024 |

Appeal from the Judgment of Sentence Entered January 31, 2024
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s):  CP-36-CR-0006695-2019

BEFORE:  OLSON, J., DUBOW, J., and McLAUGHLIN, J.

MEMORANDUM BY OLSON, J.:                    **FILED: DECEMBER 30, 2024**

Appellant, Justin M. Burke, appeals from the judgment of sentence entered on January 31, 2024, as made final by the denial of Appellant's post-sentence motion on February 26, 2024.  We affirm.

The trial court thoroughly summarized the underlying facts and procedural posture of this case:

> In the Spring of 2019, Appellant was introduced to [the] [19]-year-old [victim, G.E.].  At the time, [G.E.] was dating one of Appellant's best friends, Mitch Bitner.  In the months that followed, [G.E.] and Mitch frequently socialized with Appellant and his fiancée. In June, the two couples vacationed together in Florida.
>
> On July 7, 2019, Appellant invited [G.E.] to go with him to York, Pennsylvania to purchase fireworks for an Independence Day celebration scheduled later that evening. [G.E.] met Appellant at his house and they drove together to York, purchased the fireworks, and made several other stops. When they returned to Appellant's house, he told [G.E.] that she needed to come inside to see his dog.  Although [G.E.]

initially declined, Appellant insisted that she go inside with him.

When they were inside the house, Appellant told [G.E.] that she had to go into his bedroom to play with the dog because the dog did not get along with his pet cat. [G.E.] and Appellant went into the bedroom together and chatted while [G.E.] played with the dog on the floor. After a few minutes, Defendant asked [G.E.] if she wanted to lay with him on his bed to watch a movie. [G.E.] replied that she did want to watch a movie but preferred to stay on the floor. Appellant turned on a movie and pulled a desk chair next to the bed for [G.E.] to sit on.

As the movie played, Appellant began touching [G.E.'s] body with his feet. Even though [G.E.] asked him to stop, Appellant continued and lifted up her dress with his toes. [G.E.] told Appellant that it was time for her to leave and reached down to grab her car keys from the floor. At that moment, Appellant grabbed [G.E.] by the wrist and pulled her onto the bed. Appellant climbed on top of [G.E.] and straddled her. He used one hand to hold [G.E.'s] wrist down and, with his other hand, Appellant began removing [G.E.'s] dress. [G.E.] repeatedly asked Appellant to stop.

After Appellant pulled [G.E.'s] dress off, he started fingering her vagina. [G.E.] continually pleaded with him to "stop, stop, stop." [G.E.] tried to pull Appellant's fingers out of her vagina, but Appellant told her to "shut up, shut up," and assured her that she was "fine." Appellant then took off his own pants. [G.E.] again told Appellant that it was time for her to leave. Instead of allowing [G.E.] to leave, Appellant grabbed the back of her head and forced her down to his penis. He told [G.E.] to "lick it." When she did not comply, Appellant put both of his hands on [G.E.'s] head, held her down, and started thrusting his penis inside of her mouth.

When [G.E.] refused to participate in giving Appellant oral sex, he pulled her up by her hair and made her straddle him. He wrapped both of his arms around [G.E.'s] back and held her tightly against his body. Appellant then used one hand to force his penis inside of [G.E.'s] vagina. [G.E.'s] vagina was dry and Appellant was struggling to fully penetrate her. [G.E.] began crying and continued to beg Appellant to stop.

Appellant became frustrated and told [G.E.] to "grab the fucking lube." Appellant told [G.E.] where to find it and she complied.

When [G.E.] returned to the bed, she again told Appellant that it was time for her to go and tried to get her keys for a second time. Appellant grabbed her and pulled her back onto the bed. While Appellant held [G.E.] with one arm, he applied lubricant to his own penis and inserted it into [G.E.'s] vagina. [G.E.] continued to ask Appellant to stop and begged him to think about his fiancée. Appellant continued to penetrate her.

Appellant then pulled his penis out of [G.E.'s] vagina, pushed [G.E.'s] head to his groin, forced his penis into her mouth, and ejaculated in her mouth. After ejaculating, Appellant got off the bed and went to the bathroom. He began laughing and asked [G.E.] if she thought that his fiancée would like to have a "threesome" with them. While Appellant was in the bathroom, [G.E.] was finally able to grab her keys, get dressed, and leave the apartment.

The next day, [G.E.'s] sister drove her to Lancaster General Hospital where she underwent a sexual assault examination. The examination revealed redness, swelling, and tenderness to [G.E.'s] vagina from her external labia all the way to her cervix, which was consistent with forceful intercourse. The SAFE nurse encouraged [G.E.] to report the assault to the police.

A few days after the assault, [G.E.] met with Detective Matthew Shuey from the Elizabethtown Police Department for an interview. Following the interview and further investigation, Detective Shuey asked [G.E.] whether she would be comfortable meeting with Appellant while wearing a wire. [G.E.] agreed to participate.

[G.E.] first met with Appellant on August 29, 2019, at Rita's Italian Ice in Elizabethtown. Undercover detectives were on scene during the meeting, could see [G.E.] and Appellant, and could hear their entire conversation through a listening device that [G.E.] had with her. The conversation was also recorded. The investigating officers instructed [G.E.] to be

as nice as possible during the meeting and to act like nothing was wrong to encourage Appellant [to] speak freely.

During the meeting, Appellant apologized and admitted that he was "still not sure exactly what happened." He told [G.E.] that he had "fucked up" and that he "wish[ed] that if [he] did that, it wasn't with a friend," but then stated that "ultimately [he] could be in jail if it wasn't [with a friend]." Appellant also said:

What does that make me? What does that mean? That's the question I want answered. That's what I need to figure out and that's honestly why I'm in the counseling. I go every week, every Monday.

. . .

I go every Monday with these guys and we talk about similar stuff every Monday. And one of the guys had done what I did to you to his wife . . . they're married, and he was in prison for eight years. And she didn't want it, and it was not consensual, in regards that she did not consent. He was in prison for eight years and now has five years probation and has to register for a sex offender for the rest of his life. He can't be around kids. . . . He said, you'll never understand what they felt unless you talk to them.

In response, [G.E.] told Appellant that "it wasn't the best experience" and Appellant said he "wish[ed] he could take it back." [G.E.] stated that she, too, had started going to counseling on Mondays and that she is "getting through it."

[G.E.] agreed to a second wired conversation with Appellant. She met Appellant on September 19, 2019. Like the first operation, undercover detectives were on scene during the meeting, could see [G.E.] and Appellant, and could hear their entire conversation through a listening device that [G.E.] had with her. During this meeting, both Appellant and [G.E.] again spoke about going to counseling. Appellant also said that he "had a knot in [his] stomach for a while . . . not only because [he] was scared, but because [he] hurt [G.E.] and also because [he] knew [he] did something wrong." When [G.E.] asked what he was afraid of, he replied,

- 4 -

If you said one thing, if you went to the police right now and said one thing about it, there's not a question that I'm in jail for years. So, that was, still is scary to be honest, sorry.

[G.E.] and Appellant exchanged the following words:

[G.E.:] Did you have to like, talk about me at your meeting?

[Appellant:] So, no name, but yes, definitely. . . . So, you have to go through a list of all these like, you know, possible victims, you know? Even if it's not, not only you being the one victim, but possible victims as well, so, I mean, they basically tear it apart.

[G.E.:] Well, like with you, like, like say you went in there, right? And you were like, since you and you told them about me, how don't they like, didn't you get nervous like they were going to arrest you right there? For rape or something?

[Appellant:] So, the one thing is that, they have confidentiality for telling the truth. They can't. If you went in there, yea, is basically what I'm saying.

. . .

[Appellant:] None of it's comfortable to say in front of you ever. Ever.

[G.E.:] At least it wasn't a stranger. Like they would have really been . . .

[Appellant:] Sometimes I think it would have been better.

[G.E.:] They would have went right to the cops, though.

[Appellant:] If they knew me, if they knew how to get a hold of me or report it.

[G.E.:] That's true.

[Appellant:] You know what I mean? Like, sometimes, then I wouldn't have lost a friendship or hurt someone I knew. I mean, sometimes, yes, I agree with you, but also I don't, you know what I mean?

. . .

[G.E.:] Well, at least you see what you did. I mean, that's a plus, you know what I mean? They say once you accept it.

[Appellant:] Whatever.

[G.E.:] Like for me, like, I didn't do counseling for the first month and that was really hard, but once I got into counseling and talking about it, it makes it a lot easier to get past it. And then being able to talk to you about it, get everything out in the air.

[Appellant:] Okay. So, then another question comes up. Say, five or ten years from now, blah, blah, blah, you can feel comfortable being friends around me?

[G.E.:] Yea.

[Appellant:] That's something you can completely get over?

[G.E.:] I feel not fully get over.

[Appellant:] Not forget.

[G.E.:] Not forget, maybe not be around you by myself, but I mean like in a group setting? I don't think I'd mind, I guess.

[Appellant:] That's fair. I don't blame you for that. I will never do it again, but I don't blame you for setting up a boundary. I don't blame you.

[G.E.:] I mean baby steps.

[Appellant:] I'm just, yea. I'm just thinking through, I mean.

[G.E.:] Not the easiest to get over right away. But counselling does help one-on-one. It does a lot.

[Appellant:] I believe it. I mean obviously it's confidentially, so I never use your name. I call you Bob.

. . .

[Appellant:] I can honestly say though, my intention was never to hurt you. That's for sure. It was solely selfish, like for myself, you know what I mean? I'd never, it doesn't sound any better, but like in that moment I can remember you were more of an object than a person. Like, it wasn't like, fuck [G.E.], go get her or whatever. There was no anger, there was no, I don't know, it was just completely selfish. Like I wanted it, I'm gonna get it because I can or whatever. Whatever thought I had then but, it's completely selfish, it wasn't anything that you did, but.

[G.E.:] It hurts, but I think we can get past it. I mean, it's better than you not seeing what you did.

[Appellant:] Well, for sure, yes.

[G.E.:] Because that would have probably pissed, pissed me off more if you just tried to like it like, oh no, you know what I mean?

[Appellant:] Yea, fuck that, I didn't do that.

[G.E.:] Yea. And that you're willing to admit it. I don't know, see what you did. It makes it easier for me knowing that like, you see it too. I'm not crazy or anything.

[Appellant:] Yea, I fucked up, I mean. You know what I mean? Nothing else, anything else would be a lie. I can't do that.

Detective Shuey ultimately filed the following charges against Appellant: rape by forcible compulsion; involuntary deviate sexual intercourse by forcible compulsion; two counts of sexual assault; two counts of aggravated indecent assault;

and three counts of indecent assault. A jury trial commenced on November 2, 2020, and was presided over by the now-retired Honorable Howard Knisely.

Prior to the 2020 trial, the Commonwealth filed a notice of intent to introduce prior bad acts pursuant to Pa.R.E. 404(b) in the form of testimony from two women who Appellant had sexually assaulted at a college party in 2017. Judge Knisely conditionally granted the Commonwealth's Motion; the evidence was deemed admissible for the sole purpose of determining Appellant's absence of mistake regarding whether [G.E.] consented to the sexual contact. At trial, the women testified about how Appellant had non-consensually touched their vaginas and breasts. The Commonwealth also questioned Appellant about the charges of indecent assault that were filed against him because of the non-consensual touching and his resultant participation in the Accelerated Rehabilitative Disposition program.

At the close of the 2020 trial, the jury convicted Appellant of all counts and Judge Knisely sentenced Appellant to a term of 10 to 20 years incarceration. Appellant filed a timely appeal to the Superior Court, arguing that Judge Knisely had erred in allowing testimony of the 2017 assaults. Appellant argued that the Court should have deemed the evidence inadmissible because the 2017 crimes were significantly different than the circumstances surrounding his sexual contact with [G.E.]. Specifically, Appellant argued that in the 2017 assaults, he stopped touching the victims as soon as he was asked while he allegedly committed forceable sexual acts against [G.E.'s] repeated objections. He also argued that in the 2017 assaults, he was in a public space, contrasted against the allegation that he assaulted [G.E.] in a closed bedroom.

In a May 10, 2022, [memorandum], the Superior Court determined as follows:

> Our review discloses that the trial court's analysis is not supported by the record and the law. Here, [Appellant's] actions were not so unusual and distinctive as to overcome the extreme prejudice resulting from such evidence's admission. Indeed, although each victim ostensibly had a friendly relationship with [Appellant]

- 8 -

before the sexual abuse occurred, and identified [Appellant] as her abuser, [Appellant] immediately stopped touching [the 2017 victims] after his initial, nonconsensual touching but allegedly continued his assault on [G.E.] despite her protests to stop. Moreover, [Appellant] assaulted [the 2017 victims] in a hallway and touched them on their breasts and vaginas with his hands, while here, the Commonwealth asserts he raped [G.E.] vaginally in his bedroom.

The similarities between the cases did not manifest a signature method that went beyond ordinary details typical of crimes of this class and fail to reflect an absence of mistake regarding [G.E.'s] consent. In sum, the probative value of this evidence is outweighed by the potential for prejudice to the defense, as it could confuse the jury or result in unfair prejudice, in suggesting a decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially. Accordingly, we conclude that the trial court abused its discretion when it determined that such evidence was admissible to prove [Appellant's] absence of mistake regarding [G.E.'s] consent.

*Commonwealth v. Burke*, [279 A.3d 1241 (Pa. Super. 2022) (non-precedential decision) (citations and quotation marks omitted)].

The Superior Court reversed the judgment of sentence and remanded the case for a new trial.

The matter was . . . ultimately scheduled for trial to commence on October 16, 2023. In anticipation of trial, Appellant filed a motion *in limine* requesting, *inter alia*, that [the trial court] issue an order directing the "Commonwealth to sanitize any intercepted wire recordings to prevent any mention of [Appellant] receiving counseling and the reason for said counseling." In support of this request, Appellant argued that "[a]llowing this evidence at trial would create a backdoor route to introduce [Appellant's] prior bad acts, which the Pennsylvania Superior Court, in its remand to this Court, has determined may not be admitted at the new trial." On October 11, 2023, [the trial court] issued an order stating that the following wire excerpt was admissible at trial:

[Appellant:] But I go every Monday and talk with these guys and we talk about similar stuff every Monday. And one of the guys had done what I did to you to his wife, they're married, and he was in prison for eight years. And she didn't want it, and it was not consensual, in regards that she did not consent. He was in prison for eight years and now has five years of probation and has to register as a sex offender for the rest of his life. He can't be around kids, can't be, you know, all this stuff and he gave me advice and to talk to you was the first thing he said. He said, you'll never understand what they felt unless you talk to them. And I still don't think we really talked about your feelings, but at least we're talking now, you know what I mean?

[G.E.:] Yeah.

[Appellant:] But, I mean, that's exactly what he said. Talk to her first, get to know exactly how she felt because you'll never know. You made her feel some type of way, but she'll never know exactly what that is, until you actually, and most people don't get the chance to ask, you know? And so, I appreciate that, you know? At least I get to talk to you regardless how it, the outcome, you know?

[G.E.:] I mean, it wasn't the best experience.

[Appellant:] I understand that. I wish I could take it back, I really do.

[The trial court] also reserved a ruling on the remainder of Appellant's motion until trial.

On October 12, 2023, Appellant filed an amended motion *in limine* requesting, among other things, a total prohibition on any mention – from the wire recordings or otherwise – that Appellant was undergoing counseling. On October 16, 2023, [the trial court] issued an order specifically delineating the portions of the wire recording that were inadmissible by attaching a redacted transcription of the recordings as "Exhibit A." The redactions excluded references to Appellant being on probation, his prior sexual assault convictions, and

- 10 -

any intimation that his counseling was court-ordered or related to past sexual assaults. However, [the trial court] did not grant Appellant's request to have all references to counseling wiped from the recordings.

Following a four-day trial, the jury convicted Appellant of the following crimes: involuntary deviate sexual intercourse, two counts of sexual assault, and two counts of indecent assault.[1] Appellant was acquitted of rape, aggravated indecent assault by forcible compulsion, and one count of indecent assault. After receiving a pre-sentence investigation [report], [the trial court] presided over a Sexually Violent Predator and sentencing hearing on January 31, 2024. At the close of the hearing, [the trial court] determined that Appellant fit the Sexually Violent Predator criteria and [the trial court] sentenced Appellant to an aggregate term of incarceration of 11 to 22 years.

Trial Court Opinion, 5/21/24, at 1-14 (citations and some capitalization and corrections omitted).

The trial court denied Appellant's post-sentence motion on February 26, 2024 and Appellant filed a timely notice of appeal. Appellant raises one claim to this Court:

Did the trial court err in admitting recorded statements [Appellant] made which referred to his being in counseling and the reason for his being in counseling, as these statements improperly led the jury to the conclusion that he had previously been accused of and/or convicted of sexual offenses?

Appellant's Brief at 6.

We have reviewed the briefs of the parties, the relevant law, the certified record, and the opinion of the able trial court judge, the Honorable Jeffery D.

---

[1] 18 Pa.C.S.A. §§ 3123(a)(1), 3124.1, and 3126(a)(2), respectively.

Wright. We conclude that Appellant is not entitled to relief in this case, for the reasons expressed in Judge Wright's May 21, 2024 opinion. Therefore, we affirm on the basis of Judge Wright's able opinion and adopt it as our own. In any future filing with this or any other court addressing this ruling, the filing party shall attach a copy of Judge Wright's May 21, 2024 opinion, with the name of the victim redacted.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/30/2024

# IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
## C R I M I N A L

COMMONWEALTH OF PENNSYLVANIA      :
     :
     :     6695-2019
v.      :     428 MDA 2024
     :
     :
JUSTIN M. BURKE      :

## PA. R.A.P. 1925 OPINION

BY: WRIGHT, J.                                        May 16, 2024

     Justin M. Burke ("Appellant") has filed a counseled Appeal to the Superior Court from the Judgment of Sentence imposed following his convictions of Involuntary Deviate Sexual Intercourse by Forcible Compulsion, two counts of Sexual Assault, and two counts of Indecent Assault. This Opinion is written pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure. For the reasons that follow, Appellant's single claim of error is meritless and his Judgment of Sentence should be affirmed.

### BACKGROUND

     In the Spring of 2019, Appellant was introduced to nineteen-year-old C G.E. (Notes of Testimony, Jury Trial, Oct. 16–19, at 64, 290 [hereinafter "N.T. at _____"]). At the time, G.E. was dating one of Appellant's

1

best friends, Mitch Bitner. (N.T. at 64, 290). In the months that followed, G.E. and Mitch frequently socialized with Appellant and his fiancé. (N.T. at 65-67). In June, the two couples vacationed together in Florida. (N.T. at 65-67, 290).

On July 7, 2019, Appellant invited G.E. to go with him to York, Pennsylvania to purchase fireworks for an Independence Day celebration scheduled later that evening. (N.T. at 69-70). G.E. met Appellant at his house and they drove together to York, purchased the fireworks, and made several other stops. (N.T. at 72-73). When they returned to Appellant's house, he told G.E. that she needed to come inside to see his dog. (N.T. at 73-74). Although G.E. initially declined, Appellant insisted that she go inside with him. (N.T. at 73-74).

When they were inside the house, Appellant told G.E. that she had to go into his bedroom to play with the dog because the dog did not get along with his pet cat. (N.T. at 74-75). G.E. and Appellant went into the bedroom together and chatted while G.E. played with the dog on the floor. (N.T. at 75). After a few minutes, Defendant asked G.E. if she wanted to lay with him on his bed to watch a movie. (N.T. at 75). G.E. replied that she did want to watch a movie but preferred to stay on the floor. (N.T. at 75). Appellant turned on a movie and pulled a desk chair next to the bed for G.E. to sit on. (N.T. at 75).

As the movie played, Appellant began touching G.E.'s body with his feet. (N.T. at 76). Even though G.E. asked him to stop, Appellant continued and

2

lifted up her dress with his toes. (N.T. at 76). G.E. told Appellant that it was time for her to leave and reached down to grab her car keys from the floor. (N.T. at 76). At that moment, Appellant grabbed G.E. by the wrist and pulled her onto the bed. (N.T. at 76). Appellant climbed on top o G.E. and straddled her. (N.T. at 77). He used one hand to hold G.E.'s wrist down and, with his other hand, Appellant began removing G.E.'s dress. (N.T. at 77). G.E. repeatedly asked Appellant to stop. (N.T. at 77).

After Appellant pulled G.E.'s dress off, he started fingering her vagina. (N.T. at 77). G.E. continually pleaded with him to "stop, stop, stop." (N.T. at 77). G.E. tried to pull Appellant's fingers out of her vagina, but Appellant told her to "shut up, shut up," and assured her that she was "fine." (N.T. at 78). Appellant then took off his own pants. (N.T. at 79). G.E. again told Appellant that it was time for her to leave. (N.T. at 79.) Instead of allowing G.E. to leave, Appellant grabbed the back of her head and forced her down to his penis. (N.T. at 79). He told G.E. to "lick it." (N.T. at 79). When she did not comply, Appellant put both of his hands on G.E.'s head, held her down, and started thrusting his penis inside of her mouth. (N.T. at 79-80).

When G.E. refused to participate in giving Appellant oral sex, he pulled her up by her hair and made her straddle him. (N.T. at 80). He wrapped both of his arms around G.E.'s back and held her tightly against his body. (N.T. at 80). Appellant then used one hand to force his penis inside of G.E.'s vagina. (N.T. at 80). G.E.'s vagina was dry and Appellant was struggling to fully penetrate her. (N.T. at 80-81). G.E. began crying and continued to beg

3

Appellant to stop. (N.T. at 80-81). Appellant became frustrated and told to "grab the fucking lube." (N.T. at 81). Appellant told G.E. where to find it and she complied. (N.T. at 81-82).

When G.E. returned to the bed, she again told Appellant that it was time for her to go and tried to get her keys for a second time. (N.T. at 82). Appellant grabbed her and pulled her back onto the bed. (N.T. at 82). While Appellant held G.E. with one arm, he applied lubricant to his own penis and inserted it into G.E.'s vagina. (N.T. at 83). G.E. continued to ask Appellant to stop and begged him to think about his fiancé. (N.T. at 83). Appellant continued to penetrate her. (N.T. at 84).

Appellant then pulled his penis out of G.E.'s , vagina, pushed G.E.'s head to his groin, forced his penis into her mouth, and ejaculated in her mouth. (N.T. at 84). After ejaculating, Appellant got off the bed and went to the bathroom. (N.T. at 85). He began laughing and asked G.E. if she thought that his fiancé would like to have a "threesome" with them. (N.T. at 85). While Appellant was in the bathroom, G.E. was finally able to grab her keys, get dressed, and leave the apartment. (N.T. at 85).

The next day, G.E.'s sister drove her to Lancaster General Hospital where she underwent a sexual assault examination. (N.T. at 91). The examination revealed redness, swelling, and tenderness to G.E.'s vagina from her external labia all the way to her cervix, which was consistent with forceful intercourse. (N.T. at 203-04). The SAFE nurse encouraged G.E. to report the assault to the police. (N.T. at 93).

4

A few days after the assault, G.C. met with Detective Matthew Shuey from the Elizabethtown Police Department for an interview. (N.T. at 93). Following the interview and further investigation, Detective Shuey asked G.C. whether she would be comfortable meeting with Appellant while wearing a wire. (N.T. at 231-32). G.C. agreed to participate. (N.T. at 231-32).

G.E. first met with Appellant on August 29, 2019, at Rita's Italian Ice in Elizabethtown. (N.T. at 233). Undercover detectives were on scene during the meeting, could see G.C. and Appellant, and could hear their entire conversation through a listening device that G.E. had with her. (N.T. at 233-34). The conversation was also recorded. The investigating Officers instructed G.E. to be as nice as possible during the meeting and to act like nothing was wrong to encourage Appellant speak freely. (N.T. at 107).

During the meeting, Appellant apologized and admitted that he was "still not sure exactly what happened." (N.T. at 112, Commonwealth's Ex. 4). He told G.C. that he had "fucked up" and that he "wish[ed] that if [he] did that, it wasn't with a friend," but then stated that "ultimately [he] could be in jail if it wasn't [with a friend]." (N.T. at 112, Commonwealth's Ex. 4). Appellant also said:

> What does that make me? What does that mean? That's the question I want answered. That's what I need to figure out and that's honestly why I'm in the counseling. I go every week, every Monday.
>
> * * *
>
> . . . I go every Monday with these guys and we talk about similar stuff every Monday. And one of the guys had done what I did to you to his wife . . . they're married, and he was

5

in prison for eight years. And she didn't want it, and it was not consensual, in regards that she did not consent. He was in prison for eight years and now has five years probation and has to register for a sex offender for the rest of his life. He can't be around kids . . . . He said, you'll never understand what they felt unless you talk to them.

(N.T. at 112, Commonwealth's Ex. 4).

In response, G.C. told Appellant that "it wasn't the best experience" and Appellant said he "wish[ed] he could take it back." (N.T. at 112, Commonwealth's Ex. 4). G.C. stated that she, too, had started going to counseling on Mondays and that she is "getting through it." (N.T. at 112, Commonwealth's Ex. 4).

G.C. agreed to a second wired conversation with Appellant. She met Appellant on September 19, 2019. Like the first operation, undercover detectives were on scene during the meeting, could see G.C. and Appellant, and could hear their entire conversation through a listening device that G.C. had with her. During this meeting, both Appellant and G.C. again spoke about going to counseling. (N.T. at 112, Commonwealth's Ex. 5). Appellant also said that he "had a knot in [his] stomach for a while . . . not only because [he] was scared, but because [he] hurt [G.C.] and also because [he] knew [he] did something wrong." (N.T. at 112, Commonwealth's Ex. 5). When G.C. asked what he was afraid of, he replied,

> If you said one thing, if you went to the police right now and said one thing about it, there's not a question that I'm in jail for years. So, that was, still is scary to be honest, sorry.

(N.T. at 112, Commonwealth's Ex. 5).

G.C. and Appellant exchanged the following words:

6

**C.E.**      Did you have to like, talk about me at your meeting?

**Appellant:**   So, no name, but yes, definitely . . . . So, you have to go through a list of all these like, you know, possible victims, you know? Even if it's not, not only you being the one victim, but possible victims as well, so, I mean, they basically tear it apart.

**G.E.:**      Well, like with you, like, like say you went in there, right? And you were like, since you and you told them about me, how don't they like, didn't you get nervous like they were going to arrest you right there? For rape or something?

**Appellant:**   So, the one thing is that, they have confidentiality for telling the truth. They can't. If you went in there, yea, is basically what I'm saying.

                             *  *  *

**Appellant:**   None of it's comfortable to say in front of you ever. Ever.

**G.E.**       At least it wasn't a stranger. Like they would have really been . . .

**Appellant:**   Sometimes I think it would have been better.

**G.E.:**      They would have went right to the cops, though.

**Appellant:**   If they knew me, if they knew how to get a hold of me or report it.

**G.E.:**      That's true.

**Appellant:**   You know what I mean? Like, sometimes, then I wouldn't have lost a friendship or hurt someone I knew. I mean, sometimes, yes, I agree with you, but also I don't, you know what I mean?

                             *  *  *

7

G.E: Well, at least you see what you did. I mean, that's a plus, you know what I mean? They say once you accept it.

Appellant: Whatever.

G.E: Like for me, like, I didn't do counseling for the first month and that was really hard, but once I got into counseling and talking about it, it makes it a lot easier to get past it. And then being able to talk to you about it, get everything out in the air.

Appellant: Okay. So, then another question comes up. Say, five or ten years from now, blah, blah, blah, you can feel comfortable being friends around me?

G.E: Yea.

Appellant: That's something you can completely get over?

G.E: I feel not fully get over.

Appellant: Not forget.

G.E: Not forget, maybe not be around you by myself, but I mean like in a group setting? I don't think I'd mind, I guess.

Appellant: That's fair. I don't blame you for that. I will never do it again, but I don't blame you for setting up a boundary. I don't blame you.

G.E: I mean baby steps.

Appellant: I'm just, yea. I'm just thinking through, I mean.

G.E: Not the easiest to get over right away. But counseling does help one-on-one. It does a lot.

8

Appellant:      I believe it. I mean obviously it's confidentially, so I never use your name. I call you Bob.

\* \* \*

Appellant:      I can honestly say though, my intention was never to hurt you. That's for sure. It was solely selfish, like for myself, you know what I mean? I'd never, it doesn't sound any better, but like in that moment I can remember you were more of an object than a person. Like, it wasn't like, fuck G.C__, go get her or whatever. There was no anger, there was no, I don't know, it was just completely selfish. Like I wanted it, I'm gonna get it because I can or whatever. Whatever thought I had then but, it's completely selfish, it wasn't anything that you did, but.

\* \* \*

It hurts, but I think we can get past it. I mean, it's better than you not seeing what you did.

Appellant:      Well, for sure, yes.

G.C      Because that would have probably pissed, pissed me off more if you just tried to like it like, oh no, you know what I mean?

Appellant:      Yea, fuck that, I didn't do that.

G.E :      Yea. And that you're willing to admit it. I don't know, see what you did. It makes it easier for me knowing that like, you see it too. I'm not crazy or anything.

Appellant:      Yea, I fucked up, I mean. You know what I mean? Nothing else, anything else would be a lie. I can't do that. (END 51).

(N.T. at 112, Commonwealth's Ex. 5).

9

Detective Shuey ultimately filed the following charges against Appellant: Rape by Forcible Compulsion; Involuntary Deviate Sexual Intercourse by Forcible Compulsion; two counts of Sexual Assault; two counts of Aggravated indecent Assault; and three counts of Indecent Assault. A jury trial commenced on November 2, 2020, and was presided over by the now-retired Honorable Howard Knisely.

Prior to the 2020 trial, the Commonwealth filed a notice of intent to introduce prior bad acts pursuant to Pa.R.E. 404(b) in the form of testimony from two women who Appellant had sexually assaulted at a college party in 2017. Judge Knisely conditionally granted the Commonwealth's Motion; the evidence was deemed admissible for the sole purpose of determining Appellant's absence of mistake regarding whether G.E. consented to the sexual contact. At trial, the women testified about how Appellant had non-consensually touched their vaginas and breasts. The Commonwealth also questioned Appellant about the charges of Indecent Assault that were filed against him because of the non-consensual touching and his resultant participation in the Accelerated Rehabilitative Disposition program.

At the close of the 2020 trial, the jury convicted Appellant of all counts and Judge Knisely sentenced Appellant to a term of 10 to 20 years incarceration. Appellant filed a timely appeal to the Superior Court, arguing that Judge Knisely had erred in allowing testimony of the 2017 assaults. Appellant argued that the Court should have deemed the evidence inadmissible because the 2017 crimes were significantly different than the circumstances

10

surrounding his sexual contact with G.C. . Specifically, Appellant argued that in the 2017 assaults, he stopped touching the victims as soon as he was asked while he allegedly committed forceable sexual acts against G.C.s repeated objections. He also argued that in the 2017 assaults, he was in a public space, contrasted against the allegation that he assaulted G.C. in a closed bedroom.

In a May 10, 2022, Opinion, the Superior Court determined as follows:

> Our review discloses that the trial court's analysis is not supported by the record and the law. Here, [Appellant's] actions were not so unusual and distinctive as to overcome the extreme prejudice resulting from such evidence's admission. Indeed, although each victim ostensibly had a friendly relationship with [Appellant] before the sexual abuse occurred, and identified [Appellant] as her abuser, [Appellant] immediately stopped touching [the 2017 victims] after his initial nonconsensual touching but allegedly continued his assault on [G.C.] despite her protests to stop. Moreover, [Appellant] assaulted [the 2017 victims] in a hallway and touched them on their breasts and vaginas with his hands, while here, the Commonwealth asserts he raped [G.C.] vaginally in his bedroom.
>
> The similarities between the cases did not manifest a signature method that went beyond ordinary details typical of crimes of this class and fail to reflect an absence of mistake regarding [G.C.s] consent. In sum, the probative value of this evidence is outweighed by the potential for prejudice to the defense, as it could confuse the jury or result in unfair prejudice, in suggesting a decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially. Accordingly, we conclude that the trial court abused its discretion when it determined that such evidence was admissible to prove [Appellant's] absence of mistake regarding [G.C.s] consent.

Commonwealth v. Burke, No. 483 MDA 2021, 2022 WL 1468355, at *4-*5 (Pa. Super. May 10, 2022) (unpublished) (internal citations and quotations omitted).

11

The Superior Court reversed the judgment of sentence and remanded the case for a new trial.

The matter was assigned to me on August 31, 2022, and was ultimately scheduled for trial to commence on October 16, 2023. In anticipation of trial, Appellant filed a Motion *in Limine* requesting, *inter alia*, that I issue an order directing the "Commonwealth to sanitize any intercepted wire recordings to prevent any mention of [Appellant] receiving counseling and the reason for said counseling." In support of this request, Appellant argued that "[a]llowing this evidence at trial would create a backdoor route to introduce [Appellant's] prior bad acts, which the Pennsylvania Superior Court, in its remand to this Court, has determined may not be admitted at the new trial." On October 11, 2023, I issued an Order stating that the following wire excerpt was admissible at trial:

> Appellant:    But I go every Monday and talk with these guys and we talk about similar stuff every Monday. And one of the guys had done what I did to you to his wife, they're married, and he was in prison for eight years. And she didn't want it, and it was not consensual, in regards that she did not consent. He was in prison for eight years and now has five years of probation and ahs to register as a sex offender for the rest of his life. He can't be around kids, can't be, you know, all this stuff and he gave me advice and to talk to you was the first thing he said. He said, you'll never understand what they felt unless you talk to them. And I still don't think we really talked about your feelings, but at least we're talking now, you know what I mean?
>
> C.C. :    Yeah.

12

| Appellant: | But, I mean, that's exactly what he said. Talk to her first, get to know exactly how she felt because you'll never know. You made her feel some type of way, but she'll never know exactly what that is, until you actually, and most people don't get the chance to ask, you know? And so, I appreciate that, you know? At least I get to talk to you regardless how it, the outcome, you know? |
|---|---|
| G.E.: | I mean, it wasn't the best experience. |
| Appellant: | I understand that. I wish I could take it back, I really do. |

My Order also reserved a ruling on the remainder of Appellant's Motion until trial.

On October 12, 2023, Appellant filed an Amended Motion *in Limine* requesting, among other things, a total prohibition on any mention—from the wire recordings or otherwise—that Appellant was undergoing counseling. On October 16, 2023, I issued an Order specifically delineating the portions of the wire recording that were inadmissible by attaching a redacted transcription of the recordings as "Exhibit A." The redactions excluded references to Appellant being on probation, his prior sexual assault convictions, and any intimation that his counseling was court-ordered or related to past sexual assaults. However, I did not grant Appellant's request to have all references to counseling wiped from the recordings.

Following a four-day trial, the jury convicted Appellant of the following crimes: Involuntary Deviate Sexual Intercourse, two counts of Sexual Assault, and two counts of Indecent Assault. Appellant was acquitted of Rape, Aggravated Indecent Assault by Forcible Compulsion, and one count of Indecent

13

Assault. After receiving a Pre-Sentence Investigation, I presided over a Sexually Violent Predator and Sentencing Hearing on January 31, 2024. At the close of the hearing, I determined that Appellant fit the Sexually Violent Predator criteria and I sentenced Appellant to an aggregate term of incarceration of 11 to 22 years. On February 12, 2024, Appellant filed a Post-Sentence Motion arguing that his aggregate sentence constituted a manifest abuse of discretion and was clearly unreasonable. I denied the Motion on February 26, 2024.

On March 27, 2024, Appellant filed a Notice of Appeal to the Superior Court, docketed at 428 MDA 2024. On March 28, 2024, I directed Appellant to file a statement of errors complained of on appeal pursuant to Pa.R.A.P 1925(b). Appellant filed his Statement on April 26, 2024, and the Commonwealth responded on May 1, 2024.

## DISCUSSION

In his Statement, Appellant lodges a single allegation: that I erred in admitting recorded statements which referred to his being in counseling and the reasong for his being in counseling. According to Appellant, these statements improperly led the jury to conclude that he had been previously accused of and/or convicted of sexual offenses, which resulted in the admission of evidence which was held inadmissible by the Superior Court after Appellant's prior trial.

As referenced above, following Appellant's first trial, the Superior Court determined that Appellant's prior crimes of sexual assault were inadmissible under Pennsylvania Rule of Evidence 404(b). "Generally, evidence of prior bad

14

acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity." Commonwealth v. Aikens, 990 A.2d 1181, 1185 (Pa. Super. 2010). However, for the reasons explained herein, Appellant's recorded statements regarding his participation in counseling—as redacted—simply do not imply that he had assaulted other women prior to assaulting G.C.. Thus, Rule 404(b) has no applicability in this context and Appellant's claim of error is baseless.

In their original, unredacted form, the wire recordings of Appellant's conversations with G.C. did contain references to his counseling being court-ordered and related to his prior assault convictions. Admission of these statements would have unquestionably violated 404(b) and the Superior Court's prior ruling. Consequently, I meticulously reviewed the wire transcripts line by line and made redactions that both preserved the highly probative nature of Appellant's confessional statements *and* heeded the Superior Court's apt directive.

Contrary to Appellant's assertion, the redacted version of the recordings entered as trial exhibits and played for the jury did not trigger 404(b) concerns or risk violating the Superior Court's prior order. Immediately prior to mentioning counseling when he first met with G.C., Appellant told her that he had "fucked up" and "was scared for days" because he "wasn't sure where [she] was going to go with this." (N.T. at 112, Commonwealth's Ex. 4). He then asked, rhetorically, "What does that make me? What does that mean?" and made the following statement:

15

That's the question I want answered. That's what I need to figure out and that's honestly why I'm in the counseling. I go every week, every Monday.

\* \* \*

But I go every Monday with these guys and we talk about similar stuff every Monday. And one of the guys had done what I did to you to his wife, they're married, and he was in prison for eight years. And she didn't want it, and it was not consensual, in regards that she did not consent. He was in prison for eight years and now has five years probations and has to register as sex offender for the rest of his life. He can't be around kids, can't be, you know, all this stuff and he gave me advice and to talk to you was the first thing that he said. He said, you'll never understand what they felt unless you talk to them. And I still don't think we really talked about your feelings, but at least we're talking now, you know what I mean?

\* \* \*

But, I mean, that's exactly what he said. To talk to her first, get to know exactly how she felt because you'll never know. You made her feel some type of way, but she'll never know exactly what that is, until you actually, and most people don't get the chance to ask, you know? And so, I appreciate that, you know? At least I get to talk to you regardless how it, the outcome, you know?

(N.T. at 112, Commonwealth's Ex. 4). A few moments after Appellant told G.C. that he was in counseling, G.C. disclosed that she, too, had started counseling following the assault. (N.T. at 112, Commonwealth's Ex. 4). As the conversation unfolded, both G.C. and Appellant discussed how their respective therapies had been beneficial. Appellant did not say that he was forced to go to counseling or was seeking therapy because of past convictions. As redacted, Appellant's initial statements about counseling indicate that Appellant knew that he assaulted G.C. and was trying to make sense of his own abhorrent conduct.

16

In their second recorded conversation, both G.E. and Appellant again discussed their participation in counseling following the assault. After Appellant discussed his group therapy, G.E. asked if he had to "talk about [her] at [his] meeting." (N.T. at 112, Commonwealth's Ex. 5). Appellant responded that he did and stated that he was not worried about being charged with rape because of confidentiality requirements. (N.T. at 112, Commonwealth's Ex. 5). G.E. also discussed her counseling and noted that "counseling does help one-on-one," but clarified that her therapy centered on talking about how to "get over" the assault rather than discussing the details of what happened. (N.T. at 112, Commonwealth's Ex. 5).

Here again, none of the references to counseling suggest that Appellant was court-ordered to participate because of prior sexual assaults. Appellant's statement that he was expected to talk about his victim does not lead to the conclusion that he had other victims or had been previously accused/convicted of sexual offenses. Rather, in light of the careful redactions, Appellant's statements suggest that after he assaulted one of his close friends, he decided to seek out professional therapeutic help which, necessarily, involved admitting to what he had done in a confidential environment.

Appellant's insistence that his counseling-related statements improperly led the jury to conclude that he had previously been accused of and/or convicted of sexual offenses is altogether unsupported by an objective reading of the wire transcripts. The redacted recordings do not paint a picture of a serial sexual predator—which would have been an accurate but inadmissible

17

portrayal. Instead, when viewed from the perspective of a juror with no knowledge of Appellant's propensity for crimes of sexual violence, the redacted wire recordings depict Appellant as a disturbed individual who chose to participate in counseling to process why he lured G.E. into his bedroom and assaulted her. Therefore, the Superior Court's ruling regarding 404(b) evidence was not violated by my decision to allow references to apparently voluntary therapy that were enmeshed with Appellant's unequivocal confession to having assaulted G.E.

## CONCLUSION

For these reasons, each of the errors that Appellant complains of are without merit and his appeal should be denied. Accordingly, I enter the following:

18